UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

FRANCIS FOGARTY, JR.,

     Plaintiff,           Civil Case No. 15-v-01454
                           (GLS/DJS)
     -against-

CITY OF TROY and City of Troy Police Officers KYLE
JONES and ROBERT SMITH, both individually and/or as
agents, servants, and/or employees of the City of
Troy,

     Defendants

_____

     EXAMINATION BEFORE TRIAL of the Defendant, Troy

Police Officer **KYLE JONES**, held pursuant to notice, on

January 23, 2017, at 11:05 a.m. in the law offices of

Bailey, Johnson, DeLeonardis & Peck, PC, Pine West

Plaza 5, Suite 507, Washington Avenue Extension,

Albany, New York, before Mary Ellen Tardiff, a

Shorthand Reporter and Notary Public in and for the

State of New York.


APPEARANCES:

For the Plaintiff:
THE KINDLON LAW FIRM, PLLC
74 Chapel Street
Albany, New York 12207
GENNARO D. CALABRESE, ESQ.

For the Defendant City of Troy:
RICHARD T. MORRISSEY, ESQ.
Corporation Counsel
City of Troy
245 River Street
Troy, New York 12180

For the Defendants Kyle Jones and Robert Smith:
Bailey, Johnson, DeLeonardis & Peck, PC
Pine West Plaza 5, Suite 507
Washington Avenue Extension
Albany, New York 12205
BY:   JOHN W. BAILEY, ESQ.

Also Present:
Robert Smith

## S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between

the attorneys for the respective parties hereto that

presence and oath of a Referee be waived;

IT IS FURTHER STIPULATED AND AGREED that the

transcript be signed and that the filing of the

original transcript with the Federal Court be waived;

IT IS FURTHER STIPULATED AND AGREED that all

objections, except as to form, are reserved until the

time of trial;

IT IS FURTHER STIPULATED AND AGREED that this

1  deposition may be utilized for all purposes as

2  provided by the Federal Rules of Civil Procedure;

3      AND FURTHER STIPULATED AND AGREED that all rights

4  provided to all parties by the Federal Rules of Civil

5  Procedure shall not be deemed waived and the

6  appropriate sections of the Federal Rules of Civil

7  Procedure shall be controlling with respect thereto.

8

9              (Plaintiff's Exhibits 1, 2, 3, 4

10             and 5 were marked for identification.)

11

12              **K Y L E    J O N E S,**

13  having been first duly sworn by the Notary Public, was

14  examined and testified as follows:

15  **EXAMINATION BY MR. CALABRESE:**

16      Q.    My name is Gennaro Calabrese.  I'm an

17  attorney with the Kindlon Law Firm.  I represent the

18  plaintiff, Francis Fogarty.  Could you state your name

19  for the record?

20      A.    Kyle Jones.

21      Q.    I'll go over a couple of ground rules for

22  the deposition.  One, all the answers have to be

23  verbal so the court reporter can have a full and

complete transcript. Okay?

    A.    Sure.

    Q.    Kindly wait for me to answer my question even though you may know what I'm going to say before you answer so, again, we can have a full and complete transcript. Okay?

    A.    Yes.

    Q.    If you need a break, please let me know but kindly answer the question before you take that break. Okay?

    A.    Yes.

    Q.    And if you answer a question without telling me you don't understand it, we're going to presume you understood what I was asking. Okay?

    A.    Okay.

    Q.    So it's important if you don't understand or anything I say doesn't make sense to you please, let me know so I can change it. Okay?

    A.    Yes.

    Q.    Have you consumed anything in the last 24 hours that may impair your ability to think clearly today?

    A.    No.

1       Q.    Have you ever been a named party in a

2 lawsuit before?

3       A.    Yes.

4       Q.    As a plaintiff or a defendant?

5       A.    It was through work so I would assume

6 defendant.  I was a police officer.

7       Q.    It was in your capacity as a police

8 officer?

9       A.    Yes.

10      Q.    How long ago was that lawsuit?

11      A.    2011, 2012, somewhere in there.

12      Q.    Who was your attorney?

13      A.    Ian Silverman was the corporation counsel

14 through the city.

15      Q.    Do you remember the name of the plaintiff

16 in that lawsuit?

17      A.    Brian Houle.

18      Q.    And do you remember how that resolved?

19      A.    There was a settlement the city, the city

20 paid.

21             MR. BAILEY:  Objection.

22      Q.    I guess without stating how much it

23 settled for, you can say that it settled?

1          A.      Yeah, it settled.  I don't even really

2    remember the exact amount.

3          Q.      You don't even have to say the amount.

4          A.      Yeah, it was settled.

5          Q.      Okay.  Do you remember, were there any

6    other named defendants in that lawsuit?

7          A.      I don't.  It involved me.  I don't know if

8    there was other officers or the city or -- I don't

9    remember what was on the lawsuit.

10         Q.      All right.  So beside that lawsuit, have

11   you been a named party in any other lawsuit?

12         A.      Not that I can remember.

13         Q.      All right.  Have you ever sat for a

14   deposition before?

15         A.      Yes.  Yeah.

16         Q.      Was it in that lawsuit that we just talked

17   about?

18         A.      No.

19         Q.      All right.  Was it an administrative

20   proceeding?

21         A.      I guess.  I don't -- I was a witness to

22   another lawsuit in my capacity as a police officer when

23   I was employed by the Town of North Greenbush.

1      Q.    Do you remember what year that was?

2      A.    I don't.

3      Q.    Do you remember the name of the plaintiff?

4      A.    I don't know if the guy was suing the chief

5 or the Town of North Greenbush back then.  I don't know

6 what he was actually, what his goal was.  I don't know

7 what the lawsuit was for.

8      Q.    Okay.  Do you remember what the lawsuit

9 was about?

10     A.    I think it was because he was getting

11 stopped or harrassed by the police or he thought he

12 was.  He thought, like, the chief or the town

13 supervisor or somebody was, like, directing people to

14 do that to him so that myself and other officers were

15 called in in the deposition process, I think.

16     Q.    Did you sit for any other depositions

17 beside the one you just mentioned?

18     A.    No.

19     Q.    Have you ever testified as a witness in a

20 civil proceeding?  Meaning, have you ever testified at

21 a trial in a civil proceeding?

22     A.    No.

23     Q.    Have you ever testified in an

```
 1   administrative proceeding?
 2        A.    Nope.
 3        Q.    Okay.
 4              MR. BAILEY:  Just note my
 5        objection to the form of that.  Would
 6        you mean -- just so we would get a
 7        clear answer for it, Gennaro,
 8        "administrative" meaning what, for
 9        example, because there's all kinds of
10        administrative proceedings.  Is there
11        something specific?  I don't want to
12        be misunderstood.
13          MR. CALABRESE:  I was thinking of
14        any other proceeding not involving a
15        lawsuit.
16              MR. BAILEY:  Okay.
17          MR. CALABRESE:  So with a hearing
18        officer.
19              MR. BAILEY:  All right.  So like a
20        disciplinary hearing or a labor
21        dispute or something of that kind.
22        Okay.  All right.  Can you think of
23        anything, Officer Jones, that you
```

1    testified in that you could tell Mr.

2    Calabrese about?

3         THE WITNESS:  In terms of like a

4    disciplinary hearing or of that

5    nature, no.

6    Q.    And you've testified in criminal

7 proceedings before?

8    A.    Yes.

9    Q.    You've testified at hearings in a criminal

10 proceeding?

11    A.    Yes.

12    Q.    You've testified at pre-trial hearings?

13    A.    Yes.

14    Q.    And you've testified at suppression

15 hearings?

16    A.    Yes.

17    Q.    You've testified before a grand jury

18 before?

19    A.    Yes, I have.

20    Q.    And you've testified at a trial in a

21 criminal proceeding?

22    A.    Yes.

23    Q.    And that's something you do in the course

1   of your employment as a City of Troy police officer?

2       A.      Correct.

3       Q.      What materials, if any, did you review

4   prior to coming to this deposition?

5       A.      The materials were the incident reports,

6   some audio files of Internal Affairs, things like that

7   pertaining to the arrest report and incident report.

8   Things of that nature.

9       Q.      Did you have any notes that you've taken

10  that you reviewed prior to coming here today?

11      A.      No.

12      Q.      So would it be fair to say any documents

13  reviewed were documents that are in the possession of

14  the City of Troy Police Department?

15      A.      Yes.

16      Q.      Okay.  Now, beside your attorneys, did you

17  speak to anyone in preparation of today's deposition?

18      A.      No.

19      Q.      Is it fair to say you're currently

20  employed by the City of Troy Police Department?

21      A.      Yes, I am.

22      Q.      How long have you been employed by them?

23      A.      Almost six years.

1    Q.    Are you currently employed by any other

2    police department?

3    A.    Yes.

4    Q.    Part time?

5    A.    Yes.

6    Q.    With whom?

7    A.    The Village of Green Island Police

8    Department.

9    Q.    How long have you been employed by the

10   Village of Green Island?

11   A.    Just about a year.  Coming up, about a year.

12   Q.    Have you been employed by any other law

13   enforcement agencies?

14   A.    Yes.

15   Q.    Who?

16   A.    The Town of North Greenbush.

17   Q.    And between what years were you employed

18   by the Town of North Greenbush?

19   A.    July of 2008 to May -- actually the end of

20   April, 2011.

21   Q.    Did you work there full time at first?

22   A.    I was a full time police officer there, yes.

23   Q.    And eventually you moved to part time?

1    A.    No.

2    Q.    So you went from North Greenbush to Troy?

3    A.    Correct.

4    Q.    Okay.  Were you --

5    A.    Both full time police officers.

6    Q.    But they didn't overlap, right?

7    A.    Correct.

8    Q.    Okay.  Did you work for any other law

9    enforcement agencies?

10   A.    Other than the ones I mentioned, no.

11   Q.    Okay.  So have you had the opportunity to

12   review the Complaint in this matter?

13   A.    What do you mean by "the Complaint"?

14   Q.    Have you had the opportunity to review the

15   document in which Francis Fogarty makes his

16   allegations?

17   A.    Yes.

18   Q.    All right.  So you are aware of the

19   allegations Mr. Fogarty is making?

20   A.    Yes.

21   Q.    Can you tell me in your own words how you

22   came to first interact with Mr. Fogarty?

23   A.    He was involved in an altercation and I

```
 1  ultimately, you know, met him during that altercation
 2  and arrested him for the altercation.
 3       Q.   All right.  So when you say Mr. Fogarty
 4  was involved in an altercation, what did you see?
 5       A.   Initially I saw him arguing with who I now
 6  know to be his wife at the time, or fiancee -- I'm not
 7  sure what capacity they were, but his significant other
 8  -- on the street.  That escalated to him arguing with
 9  other citizens on the street.  And that's when I
10  initially came into contact with him, the reason for me
11  to speak to him that night.
12       Q.   All right.  So where were you when you
13  first saw Mr. Fogarty?
14       A.   I was parked in a -- I was in a marked
15  police car in uniform.  Parked in the Franklin Street
16  alley basically on Franklin Street at Broadway but on
17  the south side of Broadway out in the open.  Visibly
18  parked there in a patrol car sort of observing the
19  crowds.
20       Q.   So would it be fair to say your vehicle
21  was parked facing Bootlegger's?
22       A.   Yeah, that's correct.  I was sitting and it
23  was facing Bootlegger's, yes.
```

1    Q.    So in your view could you see the entire

2    front facade of Bootlegger's?

3    A.    Yes.

4    Q.    And what drew your attention to Mr.

5    Fogarty?

6    A.    There was -- there was a commotion involving

7    Mr. Fogarty.

8    Q.    When you say "commotion," what do you

9    mean?

10    A.    Yelling.  Screaming.  Animated gestures.

11    Arms flailing in the air.  You know, what in my

12    experience would be two people arguing and having a

13    disagreement, verbal disagreement.

14    Q.    And that was between him and his ex-wife?

15    A.    Yes.  Another female but now that we do

16    know, it was her.

17    Q.    If I say Sarah Fogarty, you know who I'm

18    talking about?

19    A.    Yes.

20    Q.    So it was between Mr. Fogarty and Miss

21    Fogarty?

22    A.    Correct.

23    Q.    So you see the two of them exchanging

1   words and, as you said, flailing their arms.  What did

2   you observe happen next?

3        A.     There was, there was yelling and screaming.

4   There was pushing and shoving, physical fight.

5        Q.     Between whom?

6        A.     Between Mr. Fogarty and another patron or

7   citizen, bystander standing on the sidewalk.

8        Q.     As you sit here today do you remember who

9   that was?

10       A.     I don't.

11       Q.     So how much time lapsed between his

12  confrontation with Miss Fogarty and him exchanging

13  shoves with another individual?

14              MR. BAILEY:  Object to the form.

15              You can answer.

16       A.     I'm trying to just answer the best I can.

17  The time between the argument or disagreement between

18  Miss Fogarty and then the citizen, the other bystander?

19  Is that what you're asking?

20       Q.     It's my understanding you testified there

21  was some pushing and shoving that you observed?

22       A.     Yes.

23       Q.     Who was that between?

1     A.    That initially was between the citizen and

2  Mr. Fogarty.

3     Q.    Okay.  So how much time lapsed between

4  when you observed Mr. Fogarty and the other citizen

5  making contact and Mr. Fogarty and Miss Fogarty having

6  a verbal confrontation?

7           MR. BAILEY:  Object to the form.

8     A.    I mean I could try to give you --

9           MR. BAILEY:  Yes.  It's not

10          appropriate for me to intervene, but I

11          do object to the form.  You want to go

12          off the record for one second?

13          (Discussion was held off the

14          record.)

15     Q.    So there came a point in time where you're

16  sitting in the patrol car, correct?

17     A.    Yes, sir.

18     Q.    And you see a confrontation between whom

19  you now know to be Miss Fogarty and Mr. Fogarty?

20     A.    Correct.

21     Q.    It's my understanding what you saw was the

22  exchange of words and hand movements?

23     A.    Yes.

1     Q.    Okay.  And then there came a point where

2 you saw Mr. Fogarty have physical contact with another

3 individual, right?

4     A.    That eventually did happen, yes.

5     Q.    How much time lapsed between Mr. Fogarty's

6 confrontation with Miss Fogarty and the physical

7 contact with another individual?

8     A.    It's important to add that there was

9 physical confrontation between Mr. And Mrs. Fogarty

10 prior to Mr. Fogarty also having an additional physical

11 confrontation with another male.  To try to answer the

12 question the best I can, I would say the physical

13 confrontation between Mr. Fogarty and Miss Fogarty

14 occurred.  There was a break in physical altercation.

15 Verbal disagreements continued maybe 30 to 40 seconds

16 to a minute or minute 30 seconds.  It's been a while.

17 You know, I don't -- I'm trying to give you the best

18 time frame.  It certainly wasn't 15 minutes but, you

19 know, we're talking a block of seconds, of 30 second

20 to, you know, maybe two minutes, that type of a time

21 frame between the time that Mr. Fogarty had the

22 altercation with the male and, the physical altercation

23 with the male.

1     Q.     What type of physical contact did you see

2  between Mr. Fogarty and Miss Fogarty?

3     A.     They were pushing and shoving, slapping.

4  You know, hands-on.

5     Q.     Did you see -- did you see Mr. Fogarty

6  slap Miss Fogarty, or was it the other way around, or

7  was it both?

8     A.     I believe I remember both.  You know, both

9  put hands on each other.

10     Q.     Was this on the sidewalk in front of

11  Bootlegger's or was this in the street or someplace

12  else?

13     A.     I would say both.  It was both the sidewalk

14  that spilled out to the roadway.

15     Q.     Meaning the confrontation between Mr.

16  Fogarty and Miss Fogarty?

17     A.     Correct.

18     Q.     Okay.  Now, were they at any point in

19  time, prior to Mr. Fogarty having a physical contact

20  with another individual, did Mr. Fogarty leave your,

21  you know, your view?

22     A.     In terms of leaving my view, it's my

23  recollection he stayed within that immediate area.  But

1  you know, as far as my attention always drawn to him,

2  there was a lot of people there moving around.  So, you

3  know, my attention bounced between other subjects that

4  were there.  But he didn't leave the area.

5      Q.    What, if anything, did you do when you

6  observed Mr. Fogarty and Miss Fogarty have physical

7  contact with each other?

8      A.    I got out of my patrol car and tried to

9  speak with Mr. Fogarty.

10      Q.    Okay.  And when you say "tried to speak

11  with" him, why do you say "try"?

12      A.    It was difficult to get his attention.  He

13  was agitated.  He appeared as though he was

14  intoxicated.  He, you know, didn't necessarily care or

15  understand that a police officer in uniform, you know,

16  there was a presence, that I was there.  And he didn't

17  care that I was there or I was even explaining to him,

18  listen to me.  You need to stop what you're doing.

19      Q.    When you walked out of your patrol car,

20  fair to say you walked directly over to where Mr.

21  Fogarty was?

22      A.    Yes.

23      Q.    What, if anything, did you do to get his

1  attention?

2       A.    I don't remember my, the context of my exact

3  words.  But, you know, I would imagine I'd say, hey,

4  sir.  Hey, buddy.  Something to that nature to get his

5  attention.  Stop.  Look at me.  Talk to me.  Something

6  of those, of that nature.

7       Q.    Did he -- did he say anything to you when

8  you were approaching him?

9       A.    Not that I can remember.

10      Q.    After you said something to him, do you

11 remember him saying anything to you at that point?

12      A.    I mean, the exchange between myself and him

13 is specifically when I was trying to arrest him.  And I

14 was telling him he was under arrest and that to put his

15 hands behind his back.  What I recall about the

16 incident was him saying, you're not going to arrest me.

17 I don't do anything wrong.  Arrest her.  He didn't want

18 to be arrested.

19      Q.    Where did this take place?  Was it on the

20 sidewalk, in the street, or someplace else?

21      A.    I remember it being in the street.  I mean,

22 it could have carried over from the sidewalk and back

23 at the street.  We weren't stationary, you know.  We

1 weren't standing in one spot.

2     Q.    So you testified that you told Mr. Fogarty

3 he was under arrest. What were you going to place him

4 under arrest for?

5     A.    For, you know, hitting at -- hitting the

6 female. Hitting the male.

7     Q.    And again, you observed -- you said you

8 observed Mr. Fogarty slapping Miss Fogarty?

9     A.    Correct.

10     Q.    Did you observe him doing anything else to

11 her?

12     A.    Like I said, you know, push her. Shove her.

13 That type of thing.

14     Q.    And okay. Just so I understand, you got

15 out of the car, patrol car, after you saw Mr. Fogarty

16 have contact with another individual?

17     A.    And I can't -- it's been, you know, over

18 four years. I don't remember exactly when I exited the

19 patrol car, you know, specifically like you're asking.

20 I got out at sometime during what I described to you as

21 happening. I did get out of my car to get on foot and

22 approach, approach the people.

23     Q.    Can you testify as to at what point you

1   observed Mr. Fogarty having contact with another

2   individual?

3       A.      What do you mean?  By what point?

4       Q.      I mean, was it -- do you know, was it

5   before or after you got out of the car?

6       A.      That's what I'm trying.  I mean, I'd like to

7   be able to tell you exactly when.  Just it's been a

8   long time.  I know at some point in time the sequence

9   of events occurred like I described, and then I get out

10  of the car.  I continued to watch what's going on.  I

11  get out of the car at some point.  To be able to tell

12  you when exactly I got out, I don't remember that.

13      Q.      Do you remember seeing any other persons

14  having physical contact with Mr. Fogarty?

15      A.      Like I described, he punched or shoved.  He

16  had physical contact with a guy on the sidewalk.  He

17  had physical contact with Mrs. Fogarty.  It's possible

18  that there is, you know, while he was being violent or,

19  you know, trying to fight other people that somebody

20  may have grabbed him and tried to hold him back.  I

21  remember that.  But specifically like him punch

22  somebody else in the face, I don't.

23      Q.      Do you remember anybody punching or

1  pushing Mr. Fogarty besides Miss Fogarty?

2        A.     Not that I can remember, no.

3        Q.     And would it be fair to say as you were in

4  the patrol car your focus was on that street and that

5  sidewalk in front of Bootlegger's, right?

6                    MR. BAILEY:  Object to the form.

7                    You can answer.

8        A.     My -- yeah.  My intentions were to park the

9  patrol car, marked patrol car, in an area highly

10 visible so it would be the deterrent for such events,

11 like a fight or a disturbance.

12       Q.     All right.  Why did you -- you parked the

13 car facing Bootlegger's.  Is there a reason why you

14 were going to park the patrol car to have that view?

15       A.     There is a reason.  In my experience and as

16 directed by our supervisors, at that time of the night

17 between, you know, certain hours when the bars are

18 closing and a group of intoxicated subjects are all

19 kind of coming out at once, we try to, you know, park

20 in an area that's well lit and highly visible to be a

21 deterrent of, you know, quality of life, urinating in

22 the alleys and fights and just, you know, criminal

23 mischief to cars.  All these things that,

1  unfortunately, occur when a group of intoxicated people

2  are in close proximity.  So that was my intention and

3  the reasons behind me being in that specific spot on

4  that night.

5      Q.    Is there a reason you approached Mr.

6  Fogarty instead of first approaching Miss Fogarty?

7      A.    I initially got of the car and approached

8  all of them.  I didn't single anybody out.  I got out

9  and approached all of them.  I mean Mr. Fogarty, Mrs.

10  Fogarty, the other individual that was involved or

11  struck by Mr. Fogarty, and I addressed them all.  And,

12  I mean, I remember the other people on the sidewalk

13  sort of, you know, creating a crowd or circling and I

14  have them disburse as well.

15     Q.    Okay.  So when you approached, how close

16  were the three of them to each other?

17                MR. BAILEY:  Objection.  At what

18            point in time?

19     Q.    When you approached them?

20     A.    I would best describe it as they were

21  standing within close proximity.  I mean, you know, the

22  conversation probably within the same distance we're

23  sitting apart from each other, five to ten feet.

1    Q.    As you were approaching them were they

2  having conversations with each other?

3    A.    I mean, they were animated.  They were all

4  gesturing and, you know, they were upset.  They were

5  intoxicated or at least appeared to be drunk, moving

6  around and everybody was kind of all cross conversating

7  and yelling and --

8    Q.    When you first approached that group, do

9  you remember what you said?

10    A.    Specifically to what I said?  I don't

11  remember that.  I don't remember.

12    Q.    Is there a reason you focused your

13  attention on Mr. Fogarty instead of either Miss

14  Fogarty or the other individual who was involved in

15  the confrontation with you?

16                MR. BAILEY:  Object to the form.

17                You can answer.  Asked and answered,

18                but he can answer.

19    A.    Mr. Fogarty, you know, as I said, I was

20  parked there observing a lot of people and Mr. Fogarty

21  was getting my attention, you know, meaning he was

22  agitated.  He was, you know, yelling at the female,

23  Mrs. Fogarty.  He was yelling at the other citizen.

1    They had -- he was involved in a verbal altercation.

2    He was flailing his arms around.  That escalated to

3    some physical altercations between Mrs. Fogarty and

4    another, another citizen that was there where other

5    people were just simply standing around not fighting,

6    Mr. Fogarty, you know, had committed, had committed a

7    crime.  Was yelling and screaming and causing a

8    disturbance.  So my attention focused towards him.

9         Q.    When you say he committed a crime, what

10   penal law or what penal violations did he commit?

11        A.    Initially when he, you know, slapped or

12   punched or physically contacted another person, either

13   Mrs. Fogarty or the other citizen on the road or the

14   sidewalk, he committed harassment.  You know, the penal

15   law violation of harassment.

16        Q.    So when you told -- you testified earlier

17   that you told Mr. Fogarty he was under arrest, right?

18        A.    Yes, sir.

19        Q.    And so is it fair to say that he was under

20   arrest for harassment second degree?

21        A.    Yes.

22        Q.    And you testified -- just so it's clear --

23   you testified earlier, just so it's clear for me, were

1  you arresting him for his physical contact with Miss

2  Fogarty, his physical contact with the other civilian,

3  or both?

4      A.    I'd have to look at the context of the to

5  wit section in the harassment accusatory in order to,

6  you know, give you a very, very specific answer to

7  that.  I mean, you know, he committed the violation and

8  that was why I approached him and started to place him

9  under arrest.

10     Q.    Did you have any intention of also issuing

11  -- did you have any attention of also charging Miss

12  Fogarty with harassment second?

13                 MR. BAILEY:  Object to the form.

14                 You can answer.

15     A.    Intention of arresting her?  I mean, look,

16  in a perfect world if I could have had more police

17  officers there and we could have arrested everybody

18  that was causing the issue, then it would have been

19  possible to do that.  But I was only one person at the

20  time.  So I had to pick, you know, the primary

21  aggressor, so to speak, which I determined to be Mr.

22  Fogarty and the fact that he, you know, harassed Mrs.

23  Fogarty and then also a citizen and then was escalating

1  from there.

2      Q.    Is it fair to say that when you approached

3  Mr. Fogarty you didn't have to restrain him from

4  having physical contact with anybody?

5                 MR. BAILEY:  Object to the form.

6      A.    I didn't have to restrain him?  No.  My -- I

7  didn't put hands on him to prevent him from striking

8  anybody else if that's what you're asking.

9      Q.    When you approached him he wasn't hitting

10  anybody, right?

11                 MR. BAILEY:  Object to the form.

12      A.    Actively hitting somebody?

13      Q.    Right.

14      A.    No, he wasn't when I initially approached

15  him.  He had already done so.

16      Q.    And as you were walking from your patrol

17  car toward Mr. Fogarty, Mr. Fogarty was standing in

18  the street or on the sidewalk, right?

19      A.    Yes.

20      Q.    And he may have been exchanging words.  He

21  may have been flailing his arms.  But he wasn't having

22  any physical contact with anybody else during that

23  time that you approached him?

1          MR. BAILEY:  Object to the form.

2          You can answer.

3     A.    Correct.

4     Q.    Okay.  And when you approached Mr. Fogarty

5 and you told him that he was under arrest what, if

6 anything, did Miss Fogarty do at that point?

7     A.    I don't remember if Miss Fogarty was

8 standing right next to us right at that moment or if

9 she was some distance away.  So I don't know that she

10 specifically did, you know.  I can't remember the

11 specific action that she did right when I told him that

12 he was under arrest.

13    Q.    When you were walking toward Mr. Fogarty

14 did Miss Fogarty start walking in a different

15 direction?

16    A.    My recollection is that she was still there,

17 you know, but I don't remember her walking away from

18 the area.

19    Q.    As you sit here today do you remember

20 specifically, can you describe specifically the

21 physical contact that Mr. Fogarty had with the other

22 civilian?

23    A.    My best recollection is that it was

1  harassment in nature.  He either punched the male, you

2  know, in the face or the chest or, you know,

3  aggressively pushed him.  That type of a contact.

4      Q.  And again after testifying does it refresh

5  your recollection as to if you left the patrol car

6  before or after Mr. Fogarty had contact with that

7  other civilian?

8      A.  I don't understand.

9      Q.  Sure.

10      A.  Sorry.

11      Q.  Before I ask if you got out of the patrol

12  car before Mr. Fogarty had contact with the other guy.

13  Since we've been talking about it, do you now

14  remember?

15      A.  I still don't remember when I exited the

16  patrol car specifically.

17      Q.  Did you strike Mr. Fogarty outside of

18  Bootlegger's?

19      A.  No.

20      Q.  Can you, in detail, describe your

21  interaction with Mr. Fogarty outside of Bootlegger's?

22      A.  Sure.  When I approached him to explain to

23  him that he was under arrest, I tried to verbally tell

1  him to put his hands behind his back to place him in

2  custody.  He, as I said before he, you know, refused to

3  do that.  He -- when I would try to grab his arms to

4  sort off of coach him to put his hands behind his back,

5  he violently pulled his hands away and his arms away.

6  He physically elbowed me in the face during the process

7  of me trying to place him under arrest.  He continued

8  to resist arrest specifically pulling his hands away,

9  you know, refusing to listen to my orders.

10       And then subsequent Sarah Fogarty got involved.

11  She came from behind.  Pulled me.  Punched me.  Pushed

12  me in a fashion to sort of keep me from arresting Mr.

13  Fogarty and then Mr. Fogarty, because of that sort of

14  interruption, he was able to get up and run away.

15       Q.    Where did Mrs. Fogarty punch you?

16       A.    From what I remember she came from behind,

17  so like my back or side.  Grabbed at me to try to get

18  me, to pull me away from Mr. Fogarty.

19       Q.    And you said Mr. Fogarty was able to get

20  up and run?

21       A.    Correct.

22       Q.    At what point was he on the floor?

23            MR. BAILEY:  Object to the form.

Q.     Was Mr. Fogarty ever on the floor?

          MR. BAILEY:  Again, object to the

          form.  I think it's a street or a

          sidewalk, not a floor.

Q.     Let me ask it again then.  At any point in

time was Mr. Fogarty on the street or sidewalk in

front of Bootlegger's?

A.     It's possible that he, in the process of me

trying to physically place him under arrest using my

hands that, you know, he lost his footing or bent over

and put his hand or maybe a knee on the pavement of the

roadway.  My intentions were to try to get him to put

his hands behind his back and ultimately, you know, if

I have to take somebody to the ground to do that,

that's the safest position, you know, for me to do

that.  I didn't get -- in the process of trying to do

that is when Sarah Fogarty interrupted and attacked me.

And so to answer your question about being on the

floor, at no point in time do I remember him laying on

the ground or the pavement.  But when I said the words

get up and flee, just sort of remove himself from where

I was trying to place him into custody.

Q.     Did you have a taser on you?

1          A.      I don't remember if I was equipped with one

2    that night.

3          Q.      You had a baton on you, right?

4          A.      Yes.

5          Q.      When you stepped out of the patrol car and

6    walked toward Mr. Fogarty, did you have your baton in

7    hand?

8          A.      I don't specifically remember if I had it in

9    my hand or holstered when I first exited the vehicle.

10   At some point in time I did have, throughout that

11   altercation I did have the baton in my hand because I

12   recall when I was running I was holding onto it so it

13   wouldn't fall out or get lost.

14         Q.      Do you remember at what point you took it

15   out?

16         A.      Specifically, I do not.  During, during that

17   incident I remember having it out.  Specifically when,

18   I don't remember.

19         Q.      Before you got out of the patrol car did

20   you use the radio?

21         A.      What do you mean by "use the radio"?

22         Q.      Did you call in stating that there are

23   physical altercations outside of Bootlegger's?

1    A.    At some point in time I did, yes, get on the

2    radio, notify the dispatcher of my location and what

3    type of incident I had.

4    Q.    Do you remember whether or not you did

5    that before you approached Mr. Fogarty?

6    A.    I don't.  There is a record of it but, you

7    know, I haven't -- it's been almost four years and I

8    haven't listened to it since then.  So I don't -- I

9    mean, specifically what the transmissions were, I

10   don't.  I assume there's a record still on file and

11   that can be reviewed, but I don't remember.

12   Q.    Have you ever made an arrest in front of

13   Bootlegger's before?

14   A.    I can't specifically -- like, there isn't an

15   arrest that stands out.  It's possible that I did and

16   it's possible that I haven't either.  I don't remember

17   specifically anyone that stands out in front of

18   Bootlegger's.

19   Q.    Prior to this incident at any point in

20   time did you ever review the security footage -- let

21   me withdraw that and say that again.  Prior to your

22   interaction with Mr. Fogarty, at any point in time in

23   your role as a Troy police officer did you have the

1    opportunity to review security footage from

2    Bootlegger's?

3         A.    I don't remember any specific incidents

4    where I could say, you know, I investigated this and I

5    looked at the video tape on this date, but I'm aware

6    that there is or there was.  I don't know if there

7    still is.  There is video cameras inside, outside and

8    that it wouldn't be, you know, out of our regular

9    operation as a patrol when we're investigating a crime

10   to ask if there's video surveillance and maybe review

11   it.  So it's possible that I did at some point in time

12   look at a video, but I can't remember a specific case.

13   I don't know if I investigated a fight there or a purse

14   being stolen off of the bar stool.  And so they would

15   try to show us the video of the suspect that took the

16   property.  So it's possible I did look at the video,

17   but I can't remember a specific incident to share with

18   you.

19        Q.    All right.  So you've testified that

20   Fogarty ran.  And what, if anything, did you do at

21   that point?

22        A.    I pursued him.

23        Q.    Did you have to -- did you have to do

1    anything with Miss Fogarty before you pursued Mr.

2    Fogarty?

3         A.    When I was trying to arrest Mr. Fogarty,

4    Mrs. Fogarty interjected and physically attacked me.

5    So I, you know, had to separate myself between Mrs.

6    Fogarty -- separate myself from Mrs. Fogarty.  So I

7    pushed her away.  At that point he started to run.  I

8    turned my attention to Mr. Fogarty and pursued him down

9    the alley.

10        Q.    Okay.  And what alley did you pursue him

11   down?

12        A.    Franklin Street alley.

13        Q.    Okay.  And can you estimate how far ahead

14   of you he was as you were running after him?

15             MR. BAILEY:  Object to the form.

16             You can answer.

17        A.    You know, I would say my best guess of a

18   distance, maybe two to three car lengths or similar to

19   that.  40, 50 feet, something like that.

20        Q.    At any point in time did you lose sight of

21   him?

22        A.    Yes.  At the end of the alley he started to

23   turn west on State Street and, you know, from my point

1    of view made a right turn back west on State Street.

2    He was traveling south and I lost view of him as he

3    made that turn.  The alley way being narrow, I lost

4    view of him.

5        Q.    On the day that you were running down the

6    alley behind Mr. Fogarty -- on the night that you were

7    running down the alley behind Mr. Fogarty, do you

8    remember what type of lighting there was in the alley,

9    if any?

10        A.    The way I remember it it was, you know,

11   somewhat lit, somewhat dark.  Some businesses in that

12   alley would maybe have a light on and then there'd be a

13   10 or 15 foot span that didn't have a light on.  So I

14   would say it's mixed between.  I would describe it as

15   partially lit.

16        Q.    Did you observe Mr. Fogarty make any

17   movements with his hands into any pockets while he was

18   running?

19        A.    He did have -- he ultimately had something

20   in his hand, yes.  I don't know if he went into his

21   pocket.  I can't say specifically where he ended up

22   getting something in his hand but --

23        Q.    Do you remember seeing something in his

1    hand when you were running down the alley?

2        A.    That doesn't stand out in my mind.  I mean,

3    I was focused in on him.  But I don't, you know.  I

4    can't specifically tell you that.

5        Q.    All right.  So there came a point in time

6    where you lost sight of Mr. Fogarty.  Can you tell me

7    at what point you observed him again?

8        A.    It was on State Street.  When he had made

9    the right turn and when I came out of the alley to make

10   that turn, that's when I saw.  That when he came back

11   into my view.  And, you know, I observed him with

12   another officer and that officer was struggling with

13   Mr. Fogarty.

14       Q.    And what officer did you observe?  I'm

15   sorry.  Who did you observe Mr. Fogarty with?  Which

16   officer?

17       A.    Canine Officer Smith.

18       Q.    Okay.  And when you say you observed a

19   struggle, can you be more specific?

20       A.    From my perspective when I exited the alley

21   I specifically saw Mr. Fogarty resisting arrest.

22   Physically, you know, moving around and resisting

23   Officer Smith who was trying to place Mr. Fogarty, you

1    know, under arrest in custody.

2        Q.    When you observed Mr. Fogarty struggling

3    was he struggling on the street or sidewalk, or was he

4    struggling while standing up?

5        A.    He was on the ground in a position of, like,

6    all fours meaning his feet were on the ground.  The

7    balls of his feet maybe on the ground.  His hands on

8    the ground and he was trying to get back up as Officer

9    Smith was trying to, presumably, put him back down to

10   the ground and in handcuffs.

11       Q.    Did you hear either of them say anything

12   as you were approaching them?

13       A.    Yeah.  Officer Smith was telling him to get

14   on the ground and put your hands behind your back or

15   similar to that nature.  Specifically what he said, I

16   don't remember the exact words verbatim.  But we were

17   both saying that.  I said, put your hands behind your

18   back and you're under arrest, and that was being

19   uttered by Officer Smith as well.

20       Q.    Did you hear Mr. Fogarty saying anything

21   at that point in time?

22       A.    He was yelling and carrying on but I don't

23   -- like, the context of what he was saying, again he

1  didn't want to be arrested.  He wanted to get away.

2        Q.      So you observed Mr. Fogarty on all fours

3  as you said, right?  You said his hands were on the

4  ground and his feet were on the ground?

5        A.      Correct.  When I said, yeah, in that

6  fashion, you know, moving around.

7        Q.      Okay.  What do you mean "moving around,"

8  as you remember it?

9        A.      Moving around as opposed -- so maybe this

10 could be better described, as opposed to what you just

11 said on all fours meaning he's static and not moving.

12 He was kinetic and he was physically moving his

13 extremities, specifically his arms.  He was trying to

14 regain his balance and pull away from Officer Smith's

15 grip.  He was moving his legs to reposition himself and

16 his hands.  That's how I would describe someone as

17 moving.

18       Q.      Okay.  So there came a point where -- all

19 right.  You see Mr. Fogarty struggling with Officer

20 Smith.  What did you do next?

21       A.      I approached and tried to assist.

22       Q.      How did you try to assist?

23       A.      I tried to initially go hands on with my

1   left hand and push him back down to the ground.

2       Q.      With -- what part of his body?  What part

3   of Mr. Fogarty's body did you have with your left

4   hand, do you remember?

5       A.      I would say the back right shoulder area,

6   you know, upper torso area.

7       Q.      Okay.

8       A.      Specifically I don't remember where my hand

9   went to, but that was where I was trying to push him

10  down, in the upper torso area.

11      Q.      Okay.  What happened next?

12      A.      He continued to physically resist.  Wouldn't

13  put his hands behind his back.  And so at that point I

14  had, I was bent over and I had my night stick in my

15  hand, and I delivered two baton strikes with my baton

16  to Mr. Fogarty's upper torso/shoulder area.

17      Q.      And why did you do that?

18      A.      Mr. Fogarty was just involved in an

19  altercation where he attacked an innocent civilian.  He

20  attacked his wife.  And in the process of being,

21  attempting to be arrested for that, he attacked a

22  uniformed police officer.  He then fled on foot.  After

23  foot pursuit and I briefly lost sight of him, I see him

struggling with another uniformed police officer next
to a parked patrol car. Mr. Fogarty was not compliant.
He was being violent towards others. He was being
violent towards the police. And specifically in that
moment he was acting in an aggressive and physical
resistance to our arrest. So as to our training, I
used a baton to strike Mr. Fogarty ultimately to subdue
him so that we could stop the escalation of resistance
and put him in handcuffs.

Q. Why did you pick that location?

A. What location?

Q. On his back? Was there a specific
location where you struck Mr. Fogarty with the baton,
right?

A. Correct.

Q. You said it was on his back?

A. I did not, no. Where I intended to strike
Mr. Fogarty was the upper shoulder, upper arm and
shoulder area on his right side, I believe.

Q. Did your baton have any contact with his
upper shoulder area?

A. Yes.

Q. Why were you focused on hitting him in

1  that area?  Is there a reason?

2      A.    We're trained to -- we're trained in the use

3  of the baton and where to strike the baton in those

4  exact circumstances.  And based on the training it's

5  the meatiest part of a person's body.  And when I hit

6  somebody there it's safe to say that it could cause

7  some pain ultimately to gain compliance.

8      Q.    When you said it was training, was it from

9  a directive from the City of Troy Police Department or

10  was it training from some other means?

11     A.    I attended the law enforcement academy, Zone

12  Five Regional Law Enforcement Academy, for six months.

13  Part of that training was training in the use of

14  physical force and the use of a baton.  So I received

15  training there.  I receive training subsequently every

16  year in the City of Troy.  Once a year we have

17  in-service training where we refresh, so to speak, in

18  terms of training.  And those specific categories in

19  terms of force and use of the baton are covered every

20  year.

21     Q.    To your knowledge does the City of Troy

22  Police Department have a directive regarding use of

23  force with the baton?

1      A.      They do.

2      Q.      And is that directive accessible to you?

3  Like if you wanted to look at it, could you look at

4  it?

5      A.      Sure.

6      Q.      How would you go about looking at it?

7      A.      It's located on a computer.

8      Q.      You can log into a computer and review the

9  directive?

10     A.      Correct.

11     Q.      Now, earlier you testified that Mr.

12  Fogarty attacked a uniformed police officer.  Who did

13  he attack?

14     A.      Myself.

15     Q.      Okay.  So you're referring to when you

16  testified that he elbowed you in the face?

17     A.      Correct.

18     Q.      When he elbowed you in the face, were you

19  face to face with him or were you facing his back?

20     A.      I was sort of, I was facing his back.

21              (Officer Smith left the deposition

22              room.)

23     Q.      And where in the face did he hit you with

1    his elbow?

2          A.    My mouth.

3          Q.    Okay.

4          A.    My lips and mouth.

5          Q.    Okay.  Did you observe Mr. Fogarty strike

6    Officer Smith?

7          A.    No.

8          Q.    Okay.  Did observe Mr. Fogarty try to

9    strike or attempt to strike Officer Smith?

10         A.    My observations when I came around the

11   corner from the alley was Office Smith struggling with

12   Mr. Fogarty.  What his intentions were, I don't know.

13         Q.    But did you observe Mr. Fogarty, you know,

14   swing and miss at Officer Smith?

15         A.    That I did not see.

16         Q.    Did you see Mr. Fogarty try to kick but

17   miss Officer Smith?

18         A.    Mr. Fogarty's legs were aggressively moving

19   around.  And so it's fair to say that I don't know if

20   he was trying to just regain his balance or trying to

21   kick at Officer Smith.

22         Q.    But it's your testimony that when you

23   observed Mr. Fogarty with Officer Smith, Mr. Fogarty

1  was trying to run away?

2      A.    Mr. Fogarty -- my testimony was not simply

3  that he was running away.  Again, my testimony was that

4  Mr. Fogarty was in an aggressive manner moving his

5  legs, moving his arms, trying to pull away from Officer

6  Smith, trying to get back up to his feet to turn and

7  face towards Officer Smith as opposed to lying face

8  down on the ground and simply complying with verbal

9  orders that we were giving him.

10      Q.    If we could back up for a moment -- when

11  you got out of your patrol car and you were

12  approaching Mr. Fogarty, did the two of you make eye

13  contact at any point?

14      A.    I don't remember that.

15      Q.    When you approached him -- were you facing

16  each other when you approached him?

17      A.    I had a conversation with Mr. Fogarty.  I

18  addressed him.  I spoke to him.  So yeah, at some point

19  I did.  We were facing each other, sure.

20      Q.    Okay.  And that was -- was that before or

21  after you told him that he was under arrest?

22      A.    No, I tried to speak to him before he,

23  before he, you know, struck Sarah Fogarty.  So I tried

1    to address his behavior before I tried to place him

2    under arrest.  Sure.

3                      (Officer Smith re-entered the

4                      deposition room.)

5         Q.    So you were talking to Mr. Fogarty before

6    he struck Miss Fogarty?

7         A.    Yes.

8         Q.    Okay.  So is it your testimony that Mr.

9    Fogarty struck Miss Fogarty more than once?

10        A.    Yes.

11        Q.    Okay.  Where were you the first time that

12   you observed Mr. Fogarty strike Miss Fogarty?

13        A.    I was in the same exact spot that I -- I was

14   parked.  I was sitting in my patrol car observing

15   exactly the way I just testified.  I wasn't in a

16   different location.  Is that what you were asking?

17        Q.    You were in your patrol car?

18        A.    Yes.

19        Q.    And you got out of your patrol car and you

20   walked toward Mr. Fogarty, right?

21        A.    Yes.

22        Q.    And you said that you spoke to Mr.

23   Fogarty, right?

1    A.    I remember addressing -- I believe what I

2   said and testified a while ago was I addressed Mr.

3   Fogarty, Mrs. Fogarty, and there was some other

4   subjects that were on the sidewalk.  I had some type of

5   a conversation with them.

6    Q.    And, I mean, look.  I'm not trying to

7   confuse you.  I'm trying to understand the sequence of

8   events.  So if I say something that's about what you

9   testified to and it's incorrect, please say something

10  to me.  Okay?

11   A.    Sure.

12   Q.    So you're addressing Mr. Fogarty among

13  other people.  And is it your testimony that Mr.

14  Fogarty then again struck Miss Fogarty?

15   A.    The sequence of events are, the short answer

16  would be, yes.  The sequence of events are he has a

17  physical altercation with, Mr. Fogarty and Mrs. Fogarty

18  having a physical altercation, pushing, shoving,

19  involved in some type of disagreement.

20   Q.    And you're in the car for that?

21   A.    Correct.  Draws my attention.  Exactly when

22  I get out of the car, I don't know.  That initially

23  draws my attention.  He then has a physical altercation

1  with another male on the sidewalk and then an additional

2  altercation occurs between Mrs. Fogarty and Mrs.

3  Fogarty when he strikes her for no apparent reason or

4  just, you know, attacks her.  And that's when I then

5  decide to place him under arrest and attempted to place

6  him under arrest.

7              MR. BAILEY:  If I could just, I

8          think you said between Mrs. Fogarty

9          and Mrs. Fogarty.  Did you mean Mrs.

10          Fogarty and Mr. Fogarty?

11              THE WITNESS:  Correct.

12              MR. BAILEY:  Why don't you read

13          his answer back just so he

14          understands?

15              (The last answer was read by the

16          reporter.)

17              MR. BAILEY:  I just wanted it to

18          be clear.  Mrs. Fogarty wasn't

19          fighting with Mrs. Fogarty?

20              THE WITNESS:  Correct, Mr. and

21          Mrs. Fogarty were fighting.

22      Q.      So you see a second -- is it fair to say

23  you see a second altercation between Mrs. Fogarty and

1  Mr. Fogarty?

2      A.    Correct.

3      Q.    You were out of your patrol car when you

4  observed that?

5      A.    To the best of my knowledge I believe I was

6  out of the patrol car at that time.

7                  (Mr. Morrissey exited the

8                  deposition room.)

9      Q.    What kind of physical contact did you

10  observe Mr. Fogarty having with Mrs. Fogarty?

11      A.    He punched her or slapped her in the face or

12  upper torso.

13      Q.    And you had already made your presence

14  known before he did that?

15      A.    Correct.

16      Q.    So it's your testimony that he did that

17  right in front of a police officer?

18      A.    Yes, he did.

19      Q.    Okay.  So we'll move forward again, back

20  to when Officer Smith was present.

21      A.    Yes.

22      Q.    You said that you decided to take two

23  strikes or you decided to strike the shoulder with the

1  baton to subdue Mr. Fogarty, right?

2      A.      Correct.

3      Q.      So what happens?  What happened next?

4      A.      I delivered two baton strikes to his upper

5  shoulder area, to Mr. Fogarty's upper shoulder area,

6  while he was physically fighting with Officer Smith and

7  I.

8      Q.      Let me stop you there.  When you say

9  "physically fighting," again it's not your testimony

10 that he was striking either of you two at that time?

11 It's your testimony that he was resisting meaning that

12 he wasn't listening to your commands to put his hands

13 behind his back, right?

14     A.      In addition to what you just said, he was

15 also physically resisting by -- he did not, I did not

16 observe him strike Officer Smith.  But he was

17 physically resisting and moving his arms, kicking his

18 legs, trying to get back up, trying to turn and facing

19 and present himself in a manner that was non-compliant

20 and violent and tumultuous behavior.  He wasn't just

21 simply, as you stated, not listening to the verbal

22 commands.  He was doing more than that.  He was

23 physically resisting arrest.

1      Q.      I understand. But I just want to make
2  clear that you're testimony is not that he was
3  intentionally trying to strike or hit or, you know,
4  combat either you or Officer Smith?

5              MR. BAILEY:  I object to the form.
6              The answer speaks for itself. But to
7              the extent you can answer that, go
8              ahead.

9      A.      It's hard to understand what his intentions
10  were. I mean, as you just stated, he struck a female
11  right in front of a police officer. So what his
12  intentions were, I don't know. I did not, from my
13  perspective and point of view, see him strike Officer
14  Smith. But was it his intention to do that to get
15  away? That's a possibility. I simply don't know what
16  his intentions were.

17      Q.      All right. So what happened next?

18      A.      I delivered two baton strikes in rapid
19  succession from within close proximity to Mr. Fogarty's
20  right shoulder, upper torso. After the baton strikes,
21  Mr. Fogarty started to comply meaning that he stopped
22  physically trying to get away, flailing his arms,
23  kicking his feet, pulling away from Officer Smith and

1    I, acting violent.  After the baton strikes, just laid

2    there with his arms underneath his torso.  Myself and

3    Officer Smith physically pulled his hands out from

4    underneath him and placed handcuffs on him.

5         Q.    Okay.  Now, to the best of your knowledge

6    did both baton strikes hit his shoulder?

7         A.    Yes.

8         Q.    Okay.  Did you observe -- you testified to

9    the fact that after you issued baton strikes either

10   you or Officer Smith were able to place Mr. Fogarty in

11   handcuffs, correct?

12        A.    Yes.

13        Q.    Prior to having Mr. Fogarty placed in

14   handcuffs did you notice any injuries to his head?

15        A.    I didn't notice any injuries at all to, no,

16   to Mr. Fogarty.

17        Q.    All right.  Did you have any other

18   physical contact with Mr. Fogarty after he was in

19   handcuffs?

20        A.    No.

21        Q.    Okay.  Do you remember whether it was you

22   or Officer Smith or both of you who lifted Mr. Fogarty

23   from the ground?

1    A.    I don't remember who, who lifted him off the
2 ground.

3    Q.    Do you remember into -- do you remember
4 whether or not Mr. Fogarty was placed in a patrol car?

5    A.    I have knowledge he was ultimately. That's
6 how he got back to the police station. I didn't see
7 anybody put him in back of a car. I didn't lift him
8 off the ground. I don't know who did.

9    Q.    Would it be fair to say you did not drive
10 or transport Mr. Fogarty to the police station?

11    A.    Correct.

12    Q.    Okay. Did you issue more than two baton
13 strikes?

14    A.    No.

15    Q.    Okay. As you sit here today are you aware
16 of whether or not one of the baton strikes hit Mr.
17 Fogarty in the head?

18              (Mr. Morrissey re-entered the
19              deposition room.)

20    A.    I believe that the second baton strike quite
21 possibly could have struck him in the top of the head,
22 yes.

23    Q.    Now, did there come a time where you

1  learned Mr. Fogarty suffered an injury to his head?

2      A.    Yes.  Some, you know, few minutes after he

3  was placed into custody and was basically laying on the

4  ground under arrest, there was blood that we, that

5  became visible from the top of his head.

6      Q.    Did you observe blood on the ground or

7  just on his head?

8      A.    Just on his head from what I can remember.

9      Q.    Where was Mr. Fogarty when you noticed

10  that there was blood on his head?

11      A.    He was lying on the pavement where he was

12  placed in custody.

13      Q.    Okay.  So you noticed the blood before he

14  was placed into a patrol car?

15      A.    Correct.

16      Q.    Okay.  Now, when you say you noticed the

17  blood, did you just notice if it was blood on his head

18  or was it dripping down?

19      A.    There was blood, you know, coming from his

20  hair on his head dripping, starting to drip down on his

21  forehead.

22      Q.    Okay.  Do you have reason to believe that

23  he suffered that injury prior to the issuance of your

```
1   baton strikes?

2        A.    I don't have reasonable belief of that, but

3   it's certainly possible that he could have been injured

4   in the altercation that he had with the police, you

5   know, when he fell to the ground or when he was

6   fighting, yes.

7        Q.    Meaning when he fell to the ground when?

8   When he was with you in front of Bootlegger's or when

9   he was with Officer Smith?

10       A.    I guess it's possible it could have happened

11  both times, but I didn't see him go to the ground

12  initially when he was with Officer Smith.

13       Q.    Did you see him -- I mean, when you were

14  standing in front of Bootlegger's with him, and I know

15  you testified that I think, you know, at least his

16  knee or leg or hand went to the ground.  I mean, did

17  you see him hit his head?

18       A.    No, I didn't.

19       Q.    Would it be fair to say you were watching

20  him for officer safety?

21       A.    I mean, sure.

22       Q.    You were keeping your eyes on him because

23  you wanted to place him into custody, right?
```

1          A.     Correct.

2          Q.     So if he is struggling with you, you're

3    paying attention to him, right?

4          A.     I am.

5          Q.     Is it fair to say you would have seen him

6    hit his head if he hit his head at this point?

7                      MR. BAILEY:  Object to the form.

8          A.     I did not see him hit his head when I was

9    trying to place him under arrest.

10         Q.     Again, did you have any physical contact

11   with his head when you were with him outside of

12   Bootlegger's?

13         A.     No, not that I remember.

14         Q.     All right.  And I think you testified that

15   you didn't strike him in front of Bootlegger's, right?

16         A.     Absolutely not.

17         Q.     And when he was running down the alley you

18   didn't see Mr. Fogarty fall, right?

19         A.     Correct.

20         Q.     All right.  And I know you lost sight of

21   him.  But when you saw him again you didn't see him

22   fall on his head at that point, right?

23         A.     I did not see that, no.

1     Q.    And you didn't see Officer Smith strike

2 him, right?

3     A.    Correct.

4     Q.    Okay.  And when you were interacting with

5 Mr. Fogarty at Bootlegger's you didn't see any blood

6 on his head, right?

7     A.    Correct.

8     Q.    And you didn't observe anybody hitting him

9 in the head, right?

10     A.    He was involved in a, you know, in a

11 disagreement pushing and shoving.  It's possible he

12 got, you know, pushed or punched in the face or head

13 but I didn't see an injury then, you know, in front of

14 Bootlegger's.

15     Q.    Okay.  So Mr. Fogarty gets placed in a

16 patrol car.  You have nothing to do with that, right?

17 You didn't put him in the patrol car?

18     A.    I did not put him in the patrol car.

19     Q.    After there came a point where Mr. Fogarty

20 was removed from, you know, where you were standing.

21 What did you do next?

22     A.    I remember walking back where my patrol car

23 was initially parked in front of Bootlegger's and

1  Broadway and either continuing the investigation there,

2  meaning like try to get information on witnesses or

3  interview possible victims like the citizen that was

4  attacked by Mr. Fogarty.  Ultimately I returned to the

5  station to process Mr. Fogarty's arrest and Mrs.

6  Fogarty.  She was ultimately arrested as well and

7  brought back to the station.

8          Q.    Do you know who made that arrest?

9          A.    I don't remember who in terms of making that

10  arrest.  I assume you mean like --

11          Q.    Physically putting handcuffs, yeah.

12          A.    That I don't remember.  At this point now

13  there's several officer in the area and I don't

14  remember who physically put handcuffs.

15          Q.    Is it fair say that nobody else ran after

16  you when you were running after Mr. Fogarty?  Do you

17  remember anybody running behind you?

18          A.    No.  I was focused on Mr. Fogarty.  I don't

19  remember anybody running behind me.

20          Q.    Okay.  All right.  Can you describe what

21  type of material the baton is made out of that you

22  had, if you know?

23          A.    Wood.

1    Q.    It's wood?

2    A.    Yeah.  And then specifically I don't know,

3  but wood.

4    Q.    Can you describe the dimensions of it?

5    A.    Not with any specificity but I would imagine

6  30 inches or so in length.  Maybe more, maybe less by a

7  few inches.  Maybe, you know, maybe a couple pounds.

8  Maybe a pound.  Maybe 16 ounces.  Something to that

9  effect in weight.

10    Q.    Is it hollow or is it solid?

11    A.    It's solid wood, I believe.

12    Q.    So it looks like -- I'm not staying this

13  is what it is -- but it looks like one of those old

14  baseball bats that you get as a souvenir?  It's solid

15  like that?

16              MR. BAILEY:  Object to the form.

17              You can answer.

18    A.    Sure.  It's, you know, it's a stick.  It's a

19  round -- I'm trying to describe it for you best I can.

20  It's a round stick approximately 30 inches long.  I

21  mean, it's the same thickness the whole length, just

22  about.

23    Q.    Okay.  And I mean, do you hold it at the

1  bottom like a bat if you're using it?

2       A.       There's multiple ways to grip it in

3  different applications.  But specifically to this, I

4  held it not necessarily on the bottom but sort of

5  choked up further but, you know, the bottom half of it.

6  I guess you would say, the bottom portion of the baton.

7       Q.       Would it be fair to say over the course of

8  your training in the use of the baton, they teach you

9  different methods to use it?

10      A.       They do, yes.

11      Q.       And they teach you, depending on what

12 method you're using it for, you have to hold it in a

13 different way?

14      A.       Correct.

15      Q.       Are there any written training materials

16 regarding use of the baton that you're aware of?

17      A.       There is, yeah.  There has been, yeah.

18      Q.       Do you have any of them?

19      A.       I don't physically have them right now.

20      Q.       Now would be right now.  But do you have

21 access?  If you wanted to go look at those training

22 materials, can you do so when you leave here?

23      A.       I haven't done that.  You know, in the

1    academy, I would assume the academy had some type of

2    written material.  It's more of a practical training,

3    you know, practical scenario type training where, you

4    know, you're -- not necessarily a written document.

5    But I guess there is possibly a written document

6    somewhere.

7         Q.    The City of Troy Police Department, have

8    they ever given you written materials regarding the

9    use of a baton?

10        A.    It's possible.  I don't remember, you know,

11   specifically being handed a material on how to use a

12   baton.  But our in-service training that happens

13   yearly, we go over baton strikes and it's possible

14   there was a pamphlet or the instructor at that time

15   prepared a written document and issued it to the

16   officers that attended the class.

17        Q.    All right.  At any point in time did you

18   sustain any injuries?

19        A.    I remember my lips.  I had, like, a fat lip

20   from being elbowed.  But physical injury by the

21   definition of penal law, no.

22        Q.    Did anyone, any officer, take photographs

23   of the injury to your lip?

1    A.    I don't remember if they did or they didn't

2  that day or that night, I mean.

3    Q.    Okay.  Do you remember receiving any

4  medical attention?

5    A.    I did not.

6    Q.    Do you remember Officer Brian Strock being

7  present at any point in time?

8    A.    Yes.

9    Q.    At what point did he arrive?

10    A.    After Mr. Fogarty was placed into custody.

11    Q.    All right.  So he didn't say anything to

12  you to effect of, I saw what happened?  I mean, do you

13  know whether or not he saw Mr. Fogarty before he got,

14  he was placed in handcuffs?

15    A.    I'm just trying to understand.  Do I know if

16  Brian Strock saw Fogarty before he was ever arrested?

17    Q.    Based upon any conversations you had with

18  him?

19    A.    I don't know.  No, I don't know that.

20    Q.    He didn't come over to you at any point in

21  time and say, I saw what happened?

22    A.    No.

23    Q.    That's all I wanted to know.  Did you have

1 any physical contact with Mr. Fogarty's phone, cell

2 phone?

3     A.    During the process of removing his hands out

4 from underneath his torso, he was holding his phone,

5 you know, a phone in his hand. And I removed it from

6 his hand and set it to the side and placed, continued

7 or finished putting the handcuffs on him.

8     Q.    That was after you issued the baton

9 strikes?

10     A.    Yes.

11     Q.    Did you kick his phone?

12     A.    No.

13     Q.    Were you interviewed by Internal Affairs

14 regarding this case?

15     A.    Yes.

16     Q.    Do you remember how many times they

17 interviewed you?

18     A.    It was at least twice, at least two times.

19     Q.    Do you know why they interviewed you

20 twice?

21     A.    I don't know what the intentions were,

22 whether or not it was, they were following up or there

23 was a malfunction with a tape recorder or what. I

1    don't know why they did it twice.

2        Q.    Okay.  What is your understanding of the

3    conclusion of their investigation?

4        A.    I don't understand the conclusion of their

5    investigation.

6        Q.    Do you know what -- as you sit here today

7    do you know what their official determination was?

8                    MR. BAILEY:  Object to the form.

9                    You can answer.

10       A.    I know what at the time Terry Buchanan, the

11   captain at the police department, I know what his

12   opinion of the situation is.

13       Q.    And what is that?

14       A.    Based on his report that I had the

15   opportunity to look at was that his opinion is I used

16   excessive force.

17       Q.    Prior to preparing for today's deposition

18   had you ever had the opportunity to review that report

19   before?

20       A.    No.

21       Q.    I mean, did they notify you in anyway that

22   they determined that the force was excessive?

23                   MR. BAILEY:  Object to the form.

1          You can answer.

2     A.     There was a piece of paper, memo maybe form

3 or maybe in the format of a letter from, at the time,

4 Commissioner Magnetto, that in summary had what Terry

5 Buchanan's opinion was and indicated that his opinion

6 was that I used excessive force.  In addition to that

7 there was a letter that the Chief of Police, John

8 Tedesco, wrote to Mr. Fogarty and cc-ed me a copy of it

9 explaining in there that I used excessive force.

10     Q.     Was any disciplinary action taken as a

11 result of Captain Buchanan's determination?

12     A.     No.

13     Q.     How soon after the interview, the final

14 interview with Internal Affairs, did you learn what

15 Captain Buchanan's opinion was?

16     A.     How soon like in terms of days or weeks

17 or --

18     Q.     Whatever, whatever you can do.

19     A.     Honestly, I don't remember.  I mean, it

20 might have been a month.  I'd be guessing.  I really

21 don't remember when they did.  It's certainly, you

22 know, that can be found out.  That can be researched.

23 There's a date on the letter.  There's a date of the

1  incident.  So we can certainly get that figured out for

2  you, but I don't remember right now.

3       Q.    Did anybody meet with you after your final

4  interview to discuss Captain Buchanan's determination?

5       A.    In terms of meet with me, the only thing

6  that happened was I was given a copy of the summary of

7  Mr. Buchanan's opinion by Commissioner Magnetto at the

8  time he issued it.  I signed it, that I received a copy

9  of it, and that was that.

10      Q.    No face to face conversation about the

11 determination?

12      A.    There was face to face contact.

13 Commissioner Magnetto was certainly there.  He didn't

14 just leave it in a room and leave and come back.  He

15 handed it to me.  Turned it around on the table.  Slid

16 it over to me.  I looked at it.  I signed that I

17 received a copy.  I took that copy, tried to inquire

18 then what it was all about and Mr. Magnetto, or

19 correction, Commissioner Magnetto said that he

20 couldn't, he couldn't discuss it with me at the time.

21      Q.    Did anybody discuss it with you

22 afterwards?

23      A.    Afterwards?

1      Q.    Yeah.  Like after you go to -- you do this

2 interview with Internal Affairs, and then they give

3 you this determination that you used excessive force.

4 Did anybody discuss it with you about why they decided

5 that way or what you should do differently?

6      A.    By anybody do you mean, like, official

7 capacity or in general conversation?

8      Q.    Anybody with the City of Troy Police

9 Department?

10     A.    There's, you know, a lot of people will ask.

11 Co-workers would ask, hey, whatever happened with that?

12     Q.    I mean, what about anybody with authority?

13 Did anybody sit down with you and explain to you why

14 they made the determination they made?

15     A.    No.  Other than those documents that I was

16 issued, nobody talked to me.

17     Q.    I mean, did you try to talk to anybody to

18 find out why they made that determination?

19             MR. BAILEY:  Object to the form.

20             He just said he tried to talk to

21             Magnetto and Magnetto wouldn't talk to

22             him.

23     Q.    Besides the commissioner, did you try to

1  talk to anybody else with authority as to why they

2  made the determination they made?

3       A.    It was pretty clear that I didn't have an

4  opportunity to discuss the incident.  I was obviously

5  in disagreement of one person's opinion, that being

6  Terry Buchanan.  He made a mistake in his report.  So I

7  was in disagreement with that and would have liked an

8  opportunity to be able to speak to somebody about it.

9  But it was pretty clear by Commissioner Magnetto that I

10  wasn't allowed to.

11       Q.    So as far as you know there was no way you

12  could appeal that determination?

13                 MR. BAILEY:  Object to the form.

14       A.    There was.  I believe that there's a process

15  in how you will can appeal it.  I know of the PBA

16  President Fitzgerald, PBA President -- he retired.  PBA

17  President Tommy Hoffman.  He retired.  PBA President

18  Aaron Collington.  He, all three of those PBA

19  presidents.  Ian Silverman, who at the time was the

20  corporation counsel.  Mayor Rosamilla, who at the time

21  was the mayor, they met with -- this is what I was made

22  aware of.  They met with the Chief of Police, John

23  Tedesco, to try to explain to him that this wasn't

1   excessive force and that Terry Buchanan made a mistake,

2   and that the correct outcome of the investigation, you

3   know, should be talked about or at least discovered

4   here.

5          Q.     When you say made a mistake, do you mean

6   there was something factual in the report was wrong,

7   or do you mean that the determination as a whole was a

8   mistake?

9          A.     Both.

10         Q.     All right.  So with the first, factually,

11  what is it that you allege was a mistake?

12         A.     In Mr. Buchanan's report he has that I

13  struck Mr. Fogarty several times with a baton.  He

14  wrote that.

15         Q.     And that's not factually correct?

16         A.     That's incorrect.

17         Q.     But it would be factually, I mean, you

18  don't contest you struck him twice with the baton,

19  right?

20         A.     I struck Mr. Fogarty exactly twice, yes.

21         Q.     Are there any other -- in your opinion,

22  are there any other factual errors with this, with the

23  captain's investigation?

1           MR. BAILEY:  Object to the form.

2           You can answer.

3      A.     I briefly had a minute to look over it.

4  Other than that which stood out to me and the outcome,

5  which is what his opinion is -- it's an opinion based

6  report not a factually based report -- they were wrong

7  both factually and opinion based.

8      Q.     Have you ever had a -- has it been

9  determined that you violated the Code of Conduct in

10  the past?

11           MR. BAILEY:  You mean in another

12           unrelated incident?

13           MR. CALABRESE:  Right.

14      Q.     So we have one here.  I mean prior to

15  that?

16      A.     What do you mean, "we have one"?

17      Q.     Meaning the determination by the captain

18  here.  So he's saying that there was excessive force

19  used and so that's a violation of the Code of Conduct.

20  Were there any prior determinations made in your

21  capacity of the City of Troy Police Department where

22  somebody from the department said you violated the

23  Code of Conduct?

1          MR. BAILEY:  I do object to the

2          form.  His personnel file was given to

3          the federal magistrate.  It was

4          reviewed and whatever the magistrate

5          gave to you from his personnel file is

6          fair questioning.

7          MR. CALABRESE:  Right.

8          MR. BAILEY:  Okay.  I do not think

9          it is fair questioning to question him

10         about things that the federal court

11         did not disclose to you.

12         MR. CALABRESE:  Well, they did

13         disclose --

14         MR. BAILEY:  And if you want to

15         ask him about what was disclosed, I'm

16         sure that the Federal Judge disclosed

17         a matter to you, and I have no problem

18         if you question him about that which

19         was disclosed.

20    Q.    It's my understanding that there was a, it

21  was determined you violated the Code of Conduct with

22  regard to your interaction with Brian Houle?

23    A.    I'd have to -- I'd like to review the

1   document that was in my personnel file in regards to

2   Mr. Houle. My recollection of that is a counseling

3   memo, meaning that document, the counseling memo was

4   placed into my file and that I met with Captain Kehn

5   regarding my interaction with Mr. Houle and that

6   certain sections of the Code of Conduct were discussed.

7   I don't know if the verbiage on that is that I violated

8   those certain sections. I believe that it was, I was

9   re-made aware of, so to speak.

10      Q. And I'm sorry. What was Kehn's title

11   then?

12           MR. BAILEY: Captain.

13      A. He's a captain.

14      Q. What did Captain Kehn discuss with you

15   with regards to this incident, with regard to the

16   Brian Houle incident?

17      A. That discussion is on that document. It's

18   in context. It's all right -- it's a question and

19   answer and what was discussed is right on the document.

20      Q. As we sit here today, though, can you tell

21   me what it is the two of you talked about?

22      A. It was something to the -- I don't

23   specifically remember the different Codes of Conduct.

1   It was something about impartiality, you know, as that

2   pertains to the code of conduct.  But the section, I

3   don't remember.

4          Q.     Is it fair to say there was no physical

5   contact between you and Brian Houle?

6          A.     What do you mean?

7                 MR. BAILEY:  You mean use of

8                 force?

9          Q.     Right.  Brian Houle did not make a

10  complaint against you regarding excessive force,

11  right?

12         A.     It's possible that he did.  I was never

13  found to be in violation of the Code of Conduct for

14  excessive force with Brian Houle both internally and --

15         Q.     Right.  Okay.  So is it fair to say that

16  there was never a determination that you used

17  excessive force on Brian Houle?

18         A.     Correct, I have never used excessive force

19  on Brian Houle.

20         Q.     The matter that they discussed, that

21  Captain Kehn discussed with you, was separate from use

22  of force, right?

23         A.     Correct.

1      Q.    Okay.  And I mean it's your testimony that

2 Captain Kehn sat down with you and discussed what it

3 is that he thought you did wrong, right?

4      A.    No.

5      Q.    So what did he discuss with you?

6      A.    The context of that is going to be within

7 that document.  I mean, is there a way to look at that

8 document?  You can look at this document or I could

9 look at that document to provide an answer to you.  If

10 I don't have that in front of me, I can't give you --

11      Q.    Is it fair to stay you don't remember?

12      A.    No, that's not fair to say.  What is fair to

13 say is I remember there being a document with questions

14 and answers.  I sat down with Captain Kehn and it was,

15 the context of that conversation and document was to

16 show that I, that Captain Kehn handed me those sections

17 of Code of Conduct.  I read them in front of him, and

18 it was documented that I re-reviewed or, in a sense,

19 retrained on those sections of Code of Conduct.

20      Q.    Did they take any disciplinary action

21 against you for the interaction with Brian Houle?

22                 MR. BAILEY:  Object to the form of

23                     the question.  Again, if it was

1          disclosed as part of the personnel

2          file, then it's fair questioning.  If

3          it wasn't disclosed --

4                MR. CALABRESE:  Can we go off the

5          record?

6                (A short recess was taken.)

7     Q.    Officer, were you disciplined in the Houle

8  matter?

9     A.    No.

10    Q.    And were you disciplined in the Fogarty

11 matter?

12    A.    No.

13    Q.    At any point in time did you speak with

14 Sergeant Carello regarding your interaction with Mr.

15 Fogarty?

16    A.    Yes.

17    Q.    Did Sergeant Carello arrive on scene that

18 night?

19    A.    I believe he did.  I believe he, at some

20 point in time, arrived on scene.

21    Q.    Do you remember having a conversation with

22 Sergeant Carello back at the police station?

23    A.    I don't specifically remember us talking.

1      Q.     Would it be fair to say you told Sergeant

2   Carello that you were unsure as to how Mr. Fogarty

3   sustained his injuries?

4      A.     It was -- yeah.  It was, there was a

5   question as to whether that I specifically knew that I

6   caused that injury.  So he, in the process of the

7   arrest we noticed that he was injured.  So I documented

8   that he was injured and that I noticed it.  The exact

9   cause of that injury I don't know.  That, to the best

10  of my knowledge, was discussed with Sergeant Corello at

11  some point in time whether at the station, at the scene

12  or --

13     Q.     Do you remember Officer Faby being

14  present?

15     A.     I don't remember him ever being present.

16     Q.     At the scene, right?

17     A.     No, I don't remember him being there.

18     Q.     Did Sergeant Carello assist you with

19  writing any of the reports that you wrote after you

20  returned to the station?

21     A.     No.

22     Q.     Okay.  Did you have any other interaction

23  with Mr. Fogarty after he was handcuffed and placed

1  into a patrol car?

2        A.    I processed the arrest.  I booked him, yes.

3        Q.    And after that did you have any

4  interaction with him?

5        A.    You mean like in my personal life or --

6        Q.    No.  No.  Did you have any interaction

7  with him at the courthouse for arraignment?

8        A.    Not that I can remember.  I don't remember

9  what the disposition of his criminal case was.

10       Q.    Do you remember being called to any, do

11  you remember being asked to testify in regard to his

12  criminal case?

13       A.    I don't remember if there was or wasn't.

14       Q.    Do you remember discussing this case with

15  anybody from the Rensselaer County District Attorney's

16  Office?

17       A.    I don't.  I don't remember.

18       Q.    I just have a couple of documents I would

19  like to go over.  The first one was Plaintiff's

20  Exhibit 1.  It was the incident report.  Officer, are

21  you familiar with Plaintiff's Exhibit 1?

22       A.    Yes.

23       Q.    All right.  It's the incident report,

1  correct?

2      A.     Yes.

3      Q.     And you were the reporting officer for

4  this incident report?

5      A.     Correct.

6      Q.     The first question is:  On the side of the

7  report there are letters A through N?

8      A.     Correct.

9      Q.     On the first page?

10     A.     Yes.

11     Q.     And letter D you wrote "47"?

12     A.     Correct.

13     Q.     Could you tell me what the 47 stands for?

14     A.     The best of my knowledge that stands for

15  where the location occurred and 47 is outside or

16  street.

17     Q.     And after you wrote 01.  Can you tell me

18  what that stands for?

19     A.     I don't remember.  There's a chart that we

20  look at that corresponds with these letter boxes and we

21  pick from the chart what's applicable and put it in the

22  box.

23     Q.     Is this a chart that you have at the

1  police station that you can use?

2        A.      Yes.  It's a part of a DCJS form 3205.

3              MR. CALABRESE:  I make a request

4              for that chart so I can better read

5              the incident report.

6              MR. BAILEY:  So we don't lose

7              track, why don't you just print a

8              letter to me so we don't walk out of

9              here and forget about this.

10       Q.      Officer, does the chart have a name?

11       A.      It's -- this incident report is a state

12  report.  It's a DCJS 3205 report, and that form is

13  available on the website or state form and it's all

14  part of that form.

15       Q.      Okay.

16       A.      It's just a chart that you can reference

17  when your filling it out.

18       Q.      Officer, do you remember at what point in

19  time you wrote this report?

20       A.      It would have been the same -- it would have

21  been that night, the report time.

22       Q.      Did anybody assist you in writing this

23  report?

1     A.    No.

2     Q.    Okay.  In the narrative portion which is

3 box 73, one of the statements made was A1, did sustain

4 an injury consisting of a laceration on the top of his

5 head.  However it's unclear when the injury occurred.

6 Is there a reason you included that sentence in this

7 narrative?

8     A.    Yes.

9     Q.    And what is the reason?

10    A.    It's documenting on an official document

11 that the subject, Mr. Fogarty, had an injury while we

12 were arresting him.

13    Q.    Is there any reason why you used the term

14 "when" instead of "how" when you wrote it's unclear

15 when the injury occurred?

16    A.    I mean, no.  I didn't specifically.  I don't

17 have a reason that I specifically chose that word as

18 opposed to another word.  Maybe it's just because my

19 grammar's not good but --

20    Q.    Okay.  When you're writing this report,

21 was it unclear to you as to when the injury occurred?

22    A.    Yes.

23    Q.    Okay.  Could you state the facts which

1   would lead you to believe that the injury occurred at

2   a time other than when you and Officer Smith were

3   trying to handcuff Mr. Fogarty?

4        A.     You want me to state facts to support the

5   injury occurring at some other time?

6        Q.     When you wrote this report did you think

7   it occurred at a time other than when you and Officer

8   Smith were trying to arrest Mr. Fogarty?

9             MR. BAILEY:  I do object to the

10            form.  I think he was asked and

11            answered that.  I certainly will let

12            him answer it again, but I think

13            you're asking him to testify about

14            things me may not know.

15            For example, he may not know if he

16            got the injury outside Bootlegger's or

17            he may not know if he got it before he

18            rounded the corner.  But I'll let you

19            ask away.  I just, I want to be fair

20            to him with the questions.  So go

21            ahead.  Ask away.

22       Q.     At the time that you wrote the report --

23   at the time that you wrote the report, when did you

1  think the injury occurred?

2      A.    At the time I typed this report I didn't

3  know when it occurred exactly.

4      Q.    At the time that you wrote this report how

5  did you think it occurred?

6      A.    I don't.  I don't know how it would have

7  occurred.  I can't specifically say how it occurred.

8      Q.    All right.  Let me show you Plaintiff's

9  Exhibit 2.  Officer, are you familiar with Plaintiff's

10 Exhibit 2?

11     A.    Yes.

12     Q.    It's a Troy Police Department

13 Control/Restraining report.  Did you author this

14 document?

15     A.    Did I alter it?

16     Q.    Author it?  Did you write it?

17     A.    I'm sorry.  Yes.

18     Q.    Did anyone assist you with writing this

19 document?

20     A.    No.

21     Q.    Now, on page two of the report, sentence

22 N, you state, I noticed that the defendant was holding

23 an unknown black colored object in his hands.  Once

1  the defendant was on the ground, his hands were under

2  his body concealing the unknown black object. Can you

3  tell me how the defendant was holding the unknown

4  black colored object in his hands?

5      A.    Clenched in the grip of his hand.

6      Q.    At the time that you wrote this report,

7  did you know that the unknown black colored object was

8  a cell phone?

9      A.    Just give me one second.

10            MR. MORRISSEY:  To clarify, are

11            you asking at the time he wrote the

12            report later on?

13            MR. CALABRESE:  When he wrote this

14            report, yes.

15      A.    Did I know it was what?

16      Q.    When you wrote the report, when you were

17  typing the report, did you know that the unknown black

18  colored object that you observed was a cell phone?

19      A.    Yes.

20      Q.    Okay.  Is there any reason you wrote

21  "unknown black colored object" instead of cell phone?

22      A.    I wrote it where?

23      Q.    In your report?  I guess the question is:

1  How come you just didn't call it a cell phone in your

2  report?

3      A.    The purpose of this report is to take a

4  kinetic in three D event that occurred very fast and

5  quickly over the course of maybe 45 seconds to a minute

6  and then try to put it in a two dimensional document on

7  the report.  So it starts from the beginning.  Tells a

8  story.  Starts from the beginning and goes to the end.

9  The sentence where you pointed to, that was documenting

10 to the best that I could what I knew then.  And then as

11 the report evolves and information is gathered, that's

12 when I pulled his hand out from underneath him.  I

13 noticed it was a cell phone then.

14     Q.    Okay.  So it's your testimony that you did

15 not realize what was in his hand until you actually

16 pulled the object from his hands?

17     A.    Yes.

18     Q.    Okay.  All right.  Later on, if we go down

19 a couple more sentences, you write, due to the fact

20 that defendant was moving around and trying to prevent

21 officers from placing his hands behind his back, one

22 of the baton strikes inadvertently came into contact

23 with the defendant's head.  Did anybody tell you to

1  put that in there?

2        A.     No.

3        Q.     All right.  When, at what point in time

4  did you author this report?

5               MR. BAILEY:  Asked and answered.

6               Go ahead.

7        A.     The same night that the incident occurred.

8        Q.     Which did you author first:  The incident

9  report or use of force report?

10       A.     I don't remember.  I don't remember.  They

11 were both done the same night.  Which one was done

12 first, I don't remember.

13       Q.     All right.  Going back to Plaintiff's

14 Exhibit 1, the incident report, did anybody tell you

15 to put in there that it was unclear when the injury

16 occurred?

17       A.     Did anybody tell me to specifically write

18 that, no.

19       Q.     After you wrote either report, did anybody

20 review it and tell you to make any changes?

21       A.     Two separate questions.  The reports do get

22 reviewed but nobody told me to make a change from the

23 original report that I wrote.

1     Q.    So these were your original reports?

2     A.    Yes.

3     Q.    All right.  I'm going to show you

4 Plaintiff's Exhibit 3.  Officer, are you familiar with

5 this report?

6     A.    Yes.

7     Q.    All right.  Plaintiff's Exhibit 3 is a New

8 York State Domestic Incident Report.  You wrote this

9 document?

10    A.    Yes.

11    Q.    Okay.  On the first page -- let me ask

12 this:  When did you write this document?

13    A.    On the night of the incident.

14    Q.    Okay.  So it was at the same time

15 generally that you wrote the other two reports?

16    A.    Correct.

17    Q.    There's a box, if we go to the left hand

18 side you see on top dates and then below that, victim

19 party one.  And below that suspect, party two?

20    A.    Correct.

21    Q.    For suspect party two you wrote Francis

22 Fogarty, correct?

23    A.    Correct.

1      Q.     And two boxes below the name there's a box

2   that says injured.  Can you tell me why you wrote, no?

3      A.     It appears as though the time of the

4   incident that this report, the domestic incident, that

5   documents the initial verbal argument between Sarah

6   Fogarty and Francis Fogarty and that initial argument,

7   and at that time I didn't notice any injury to Mr.

8   Fogarty.

9      Q.     Just so I understand what you're saying,

10  you answered no or you filled in no because it was

11  your understanding Miss Fogarty didn't injure Mr.

12  Fogarty?

13     A.     Correct.

14     Q.     Okay.  All right.  So when filling this

15  out you weren't taking into consideration anything

16  that occurred after Mr. Fogarty and Miss Fogarty had

17  their confrontation?

18     A.     This report documents the initial verbal

19  argument between the two then married subjects, yes.

20     Q.     Okay.  And if we go to page two, could you

21  tell me who wrote that?

22     A.     Page two?

23              MR. BAILEY:  You mean the

1          narrative?

2     Q.    Could you tell me who wrote the narrative?

3     A.    I wrote the narrative.

4     Q.    And where did you get the information for

5 this narrative?

6     A.    This narrative is what Sarah said at some

7 point in time to me.

8     Q.    And if we look down below it says, there

9 is a line and it says, below the line, victim deponent

10 signature.  Above it says, refused.  Did you write

11 refused?

12    A.    Yes.

13    Q.    Why did you write refused?

14    A.    Sarah Fogarty was not cooperative and did

15 not want to sign any statements against Francis

16 Fogarty.  She didn't want to cooperate with the report.

17    Q.    Was this information obtained from her at

18 the police station?

19    A.    No.  I believe this is, this information was

20 obtained on scene initially when they got in the verbal

21 argument and I initially approached them and had

22 conversations with them.

23    Q.    Okay.  So you received this information

1    from Miss Fogarty prior to telling Mr. Fogarty that he

2    was under arrest?

3         A.    Yes.

4         Q.    Okay.  Did you obtain this information

5    from Miss Fogarty prior to witnessing a second

6    physical confrontation between Mr. Fogarty and Miss

7    Fogarty?

8         A.    I don't remember specifically if that, if

9    that's the case.

10        Q.    Was Mr. Fogarty present when you were

11   obtaining this information from Miss Fogarty?

12        A.    They both were, yes.

13        Q.    Okay.  So you were speaking with Miss

14   Fogarty and Mr. Fogarty was -- withdraw that.  Could

15   you estimate the time period between you exiting your

16   patrol car and Mr. Fogarty sort of running from you

17   down the alley, approximately?

18        A.    I believe I already tried to give you my

19   best guess there.  Like I said, it was probably between

20   the parameters of when I first started to arrest him

21   and leave and he resisted the arrest to when he started

22   running, and then it was all over maybe 30 seconds to a

23   minute and 45 seconds.  And that's a complete guess.

1     Q.    Did you speak to the citizen who got

2  punched in the face prior to telling Mr. Fogarty he

3  was under arrest?

4     A.    Yes.

5     Q.    Okay.  What, if any, statements did he

6  make to you?

7     A.    The exact words or context, I can't

8  remember.  But I inquired with him whether or not he

9  wanted to pursue charges against Mr. Fogarty.  To the

10  best of my knowledge he didn't want to.

11     Q.    Was Mr. Fogarty present for that

12  conversation or you don't remember?

13     A.    Present in what capacity?

14     Q.    Was he standing next to you?

15     A.    He was still in the immediate vicinity but I

16  don't know if he was standing right beside me.

17     Q.    Would it be fair to say he wasn't

18  participating in the conversation?

19     A.    Correct.

20     Q.    I'm going to hand you Plaintiff's Exhibit

21  4 and my question is:  Is this the letter you were

22  talking about earlier that officer, that Commissioner

23  Magnetto had you sign?

1       A.    Well, it appears as though he would have

2    signed it.  Maybe, maybe there's something else that I

3    signed that I received it.  I don't see my signature on

4    this form.  But this certainly is the letter or a copy

5    of what I was given, yes.

6       Q.    Do you remember whether or not maybe you

7    signed below the commissioner's name?

8       A.    It could be possible.

9       Q.    Okay.  Do you remember seeing this

10   document before?

11      A.    I don't know.  On the date that it was given

12   to me, yes.

13               MR. CALABRESE:  I don't have any

14               further questions.

15               MR. BAILEY:  Okay.  I'm going to

16               have these copied.

17               MR. MORRISSEY:  I'm going to have

18               some questions.

19               MR. BAILEY:  All right.

20   **EXAMINATION BY MR. MORRISSEY:**

21      Q.    I just want to clarify some points.

22   Officer Jones, my name is Richard Morrissey.  We met

23   before.  I'm the corporation counsel for the City of

Troy.  I represent the city in this case.  And at this

point I only represent the city.  I believe you

testified that you struck the plaintiff twice with

your baton, is that correct?

        A.      Yes.

        Q.      Did you intend to inflict pain when you

struck him?

        A.      No.

        Q.      You did not intend to inflict pain?  What

was the purpose of your baton strike?

        A.      My intention and the purpose for the baton

strikes was to gain compliance from Mr. Fogarty to stop

the escalation of physical resistance that he was

engaging in in order to ultimately prevent him from

further injury not only to himself, to the police, to

other citizens by placing him in custody.

        Q.      You would agree that a baton strike

inflicts pain, does it not?

        A.      I would agree that it does, yes.

        Q.      Okay.  And what you were trying to do was

-- were you using a form of force that's called pain

compliance or something like that?

        A.      That seems to be a hot topic, the pain

1  compliance verbiage.  Certainly when you are allowed to

2  use a baton and you deliver a baton strike, part of the

3  baton strike is that it's possible that it's going to

4  cause pain.  And part of our training is when that pain

5  is caused, it distracts the person from continuing the

6  escalation of force and allows them to maybe rethink

7  their decision to physically, actively to physically

8  resist any further from that point and gives us an

9  opportunity to stop them from escalating and put them

10  into custody.

11        Q.    Thank you for clarifying that.  Did you

12  intend to injure him, meaning Mr. Fogarty?

13        A.    No.

14        Q.    Did you intend to lacerate his skin?

15        A.    I did not.

16        Q.    Did you intend to strike him in the head?

17        A.    It was not my intention to strike him in the

18  head.

19        Q.    Where did you intend to strike him?

20        A.    In the upper shoulder/torso area of Mr.

21  Fogarty.

22        Q.    Would that be in his back or his front?

23        A.    Neither.  The meaty portion of Mr. Fogarty's

1  right upper arm or torso.

2      Q.    Okay.  Was he, at the time that you struck

3  him was he still or moving?

4      A.    He was moving.

5      Q.    And can you describe the movement he was

6  making?

7      A.    Sure.  He was moving his -- I've already

8  explained this.  He was moving his arms, flailing them

9  around.  Moving his legs.  His body was moving in a

10  violent and tumultuous manner.  He was pulling away

11  from the grips of police officers trying to place him

12  into custody.

13      Q.    At the time you struck him were you

14  issuing verbal commands?

15      A.    Yes.

16      Q.    What were your commands?

17      A.    To stop resisting.  To place your hands

18  behind your back.  Commands like that.

19      Q.    And was Officer Smith issuing similar

20  commands?

21      A.    Yes, he was.

22      Q.    Afterwards during the investigation of

23  your use of force, were you represented?

1      A.      In terms of did I have an opportunity --

2      Q.      Did you have -- let me break it down.  Did

3  you have union representation?

4      A.      Yes.

5      Q.      Who represented you?

6      A.      The PBA president, Bob Fitzgerald.

7      Q.      Did any other PBA officials ever become

8  involved in your representation?

9      A.      Well, this is over the course of four years.

10  Are you talking about during the interview or --

11      Q.      During the whole process of this how many

12  PBA officials represented you?

13      A.      Bob Fitzgerald, Tommy Hoffman and Ian

14  Collington.

15      Q.      And were all three of those BPA's

16  presidents?

17      A.      Yes.

18      Q.      Did you also have attorney representation

19  in the disciplinary process or any investigation

20  process?

21      A.      I personally did not have an opportunity.

22  The PBA retains a law firm, yes.

23      Q.      And what is the name of that law firm?

1    A.    Gleason, Dunn, O'Shea and Walsh, I believe.

2    I don't know if I got them all.

3    Q.    Did a member of that firm appear with you

4    or for you in the investigatory process?

5    A.    Appear?

6    Q.    Was someone with you during your

7    interview?

8    A.    No, he wasn't there during the interview.

9    Q.    Do you know if he communicated with -- do

10   you know if any attorney from that firm communicated

11   with the Troy Police Department regarding the

12   investigation?

13   A.    Yes.    There was correspondence.    I believe

14   there was a letter that he drafted, yes.

15   Q.    Did any of the officials from the PBA that

16   you named or the attorney which represents the PBA

17   accept the findings of Captain Buchanan regarding your

18   use of force?

19           MR. BAILEY:  By "accept" you mean

20           agree with?

21   Q.    Agree with.    Accept as an agreement?

22   A.    Accept -- I guess I don't understand the

23   question.

1        Q.      Okay.  Let me try to rephrase it.  Did the

2   PBA contest the findings or argue against the finding

3   that Captain Buchanan came up with?

4        A.      Yes.

5        Q.      All right.  And their attorney took the

6   same position the finding was wrong, is that correct?

7        A.      Who's attorney?  My attorney?

8        Q.      The PBA attorney.

9        A.      Yes.  Well, that's -- yes.

10       Q.      Do you know if they discussed this matter

11  with the Troy Police Department officials, their view

12  that the finding was incorrect?

13       A.      Who is "they"?

14       Q.      "They" meaning the PBA officials and your

15  representation of PBA and the PBA attorney?

16       A.      I'm aware of a letter.  I wasn't physically

17  present during any of the conversations.  But I was

18  told that there was discussion, yes.

19       Q.      And to the best of your knowledge they

20  were discussions on your behalf?  They were contending

21  that you didn't use excessive force?

22       A.      Correct.

23       Q.      In your view were the baton strikes that

1   you intend to give to Mr. Fogarty consistent with your

2   training and the policies of the Troy Police

3   Department regarding used of the baton?

4       A.      Not only were consistent with it but, yes.

5   Very, very consistent with the training then and as

6   they continue to train.  We still train.  The City of

7   Troy Police Department still trains myself and other

8   officers in that exact same convention, yes.

9       Q.      So if you hit Mr. Fogarty in the head with

10  your baton, would you describe that as an accident?

11  Or how would you describe that event?

12      A.      I would describe it as somewhat of an

13  unfortunate circumstance of events that this can be

14  considered collateral damage to a reasonable use of

15  force.  You know, baton strikes were delivered in a

16  reasonable manner.  And unfortunately, in this type of

17  an incident, specifically this one, he is not standing

18  there static, not moving.  He is moving and so when you

19  intend to hit a certain area and the subject moves or

20  ducks to avoid being hit, sometimes, you know,

21  inadvertently you may miss the target that you're

22  trying to hit.

23      Q.      His head was not your target?

1    A.    His head was absolutely not my target.

2              MR. MORRISSEY:  No more questions.

3    **EXAMINATION BY MR. CALABRESE:**

4    Q.    When you and Officer Smith were attempting

5    to place Mr. Fogarty under arrest, was Mr. Fogarty

6    yelling?

7              MR. BAILEY:  Asked and answered,

8              but go ahead.

9    A.    Yes.

10   Q.    All right.  Do you remember what he was

11   yelling?

12   A.    I mean, I kind of responded to this already.

13   The exact words and verbiage I don't, but in general he

14   didn't want to be under arrest.  He was trying to stop

15   us from arresting him.

16   Q.    Was it constant?  As you were arresting or

17   as you sit here today do you remember any other noises

18   coming from your surroundings that were loud?  If you

19   remember?

20   A.    No.  I don't specifically remember any other

21   loud noises.

22   Q.    All right.  Were there any dogs barking in

23   the background that you remember?

1       A.      Not that I remember.

2       Q.      Okay.  Again, this was at night, correct?

3       A.      Correct.

4       Q.      And so would it be fair to say there

5    wasn't much traffic going by on the street?

6       A.      That would be fair, yes.

7       Q.      Okay.  And it would be fair to say there

8    wasn't anybody around the three of you yelling at you

9    guys, that you remember?

10      A.      This is at the time that we were putting him

11   -- on State Street you're talking about?

12      Q.      Yes.

13      A.      I don't believe that there was a crowd or

14   anybody else standing around.

15      Q.      All right.  Have you ever used your baton

16   before this incident on a person?

17      A.      Yes.

18      Q.      Okay.  When you're trained on how to use a

19   baton, do you use it on another person or no?

20      A.      Well, that's a broad question.  When you're

21   -- yes and no.  I mean, different aspects of how you

22   use the baton you are sort of using it.  Certain times

23   you don't use it.  You would maybe use a dummy or a bag

1    to strike.

2         Q.    Have you ever struck a bone before with a

3    baton?

4                   MR. BAILEY:  Struck a bone?

5                   Object to the form.  Go ahead and

6                   answer.

7         Q.    Have you ever struck somebody else -- I

8    mean.  Let me try to ask that in a better way.  Prior

9    to this incident have you ever used your baton on a

10   civilian and your baton came in contact with their

11   bone when you struck them?

12                  MR. BAILEY:  Object to the form.

13                  You can answer.

14        A.    I mean, I can't specifically remember a name

15   or a date and time that something like that happened.

16   I can't remember that.

17                  MR. CALABRESE:  All right.  I have

18                  no further questions.  Thank you.

19                  (Whereupon the deposition was

20                  concluded at 1:37 p.m.)

21                  *       *       *       *

22

# I N D E X   O F   E X H I B I T S

| Plaintiff's Exhibit | Description | Page |
|---|---|---|
| 1 | Incident Report | 3 |
| 2 | Control/Restraint Order | 3 |
| 3 | Domestic Incident Report | 3 |
| 4 | Letter/Commissioner Magnetto | 3 |
| 5 | Supplemental Report | 3 |

# I N D E X   O F   E X A M I N A T I O N

Examination by Gennaro D. Calabrese, Esq.     3

Examination by Richard T. Morrissey, Esq.    93

Examination by Gennaro D. Calabrese, Esq.   100

STATE OF NEW YORK

SS:

COUNTY OF _____

 

 

 

      I have read the foregoing record of my testimony taken at the time and place noted in the heading hereof and I do hereby acknowledge it to be a true and accurate transcript of same.

 

 

_____

         **KYLE JONES**

 

 

 

Sworn to before me this

_____ day of _____, 2016.

 

 

_____
   Notary Public

# CERTIFICATION

STATE OF NEW YORK

COUNTY OF ALBANY


    I, Mary Ellen Tardiff, shorthand reporter, a notary public within and for the State of New York, duly commissioned and qualified, do hereby certify that **Kyle Jones** was duly sworn by me to testify to the truth in the cause aforesaid; that the testimony then given was reduced by me to stenotype in the presence of said witness, subsequently transcribed into English text and that the foregoing is a true and accurate transcript of the testimony so given.

    I do hereby certify that his testimony was taken **January 23, 2017,** at the place as specified in the foregoing caption.

    I do hereby further certify that I am not a relative, counsel or attorney of any party or otherwise interested in the outcome of this action.

    Witness my hand this 31st day of January, 2017.




_____

MARY ELLEN TARDIFF


Notary Public for State of New York
Commissioned in Albany County
My commission expires 11/07/2018.
UID 01TA4943991